## SANDY v. STATE.

No. A-11341. May 2, 1951.

(231 P. 2d 374.)

Caldwell, Warren & Caldwell, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J. Ralph Thomas Sandy was charged in the district court of Oklahoma county with the crime of assault with a dangerous weapon, tried before a jury, convicted, with punishment left to be fixed by the court, and sentenced to serve one year in the county jail. From the judgment rendered on the verdict, he appeals.

In the petition in error defendant assigns ten errors or grounds for reversal, and in brief argues these matters under three assignments:

I. The evidence is insufficient to support the verdict.

II. The court did not have jurisdiction of this cause, as the information fails to state facts sufficient to show commission of the crime charged.

III. The verdict is excessive, is not responsive to the issues and is not supported by the law.

This prosecution was the result of an alleged altercation at a beer tavern. The charging part of the information is as follows:

"* * * on the 1st day of May, A. D. 1948, in Oklahoma County, State of Oklahoma, Ralph Thomas Sandy * * * did then and there wilfully, unlawfully and feloniously commit the crime of assault with a dangerous weapon in the manner and form as follows, to-wit: That is to say, the said defendant, in the county and state aforesaid, and on the day and year aforesaid, then and there being, did then and there wilfully, unlawfully and feloniously and without justifiable or excusable cause, make an assault at and upon one June L. Fitzer, with a certain dangerous and deadly weapon, to-wit: a bumper jack, a more full and correct description of which is to your informant unknown, had and held in the hands of said defendant by hitting the said June L. Fitzer on the left side of the face and head with the said bumper jack, and deadly weapon, as above described, and seriously injuring the said June L. Fitzer, with the intent to do great bodily harm to the said June L. Fitzer. * * *"

The state used five witnesses, and the defendant testified in his own behalf, but offered no other witness.

June L. Fitzer and her date J. C. Thompson (whom she had married prior to the date of the trial) had met her brother Wayne V. Stickney and his wife Clarice at the Elm Tree Drive Inn on Southwest Twenty-Ninth street, in Oklahoma City, some time after 11:30 on the night of the difficulty, and they remained there until the tavern closed some time after midnight. As the four were leaving the tavern, and Thompson and June L. Fitzer had gotten in their

car, the Stickneys were standing at the car talking when it is alleged the accused backed into the Stickney automobile.

June L. Fitzer testified that she could not state that she saw the accused hit her brother's car, but her brother called to the accused to "wait a minute" and he and his wife went to their car; she saw the accused "swing at Wayne with something, I didn't know what it was, I just rushed up there." Her brother was in the front seat of his car, and she thought accused was beating him with something. She testified that she was not conscious of running to the car, that Wayne was in the car with the door open and one foot on the ground. The next thing she remembered was some one picking her up off the ground, her brother called an ambulance, but her date did not wait for it and took her to a hospital where she remained two hours and fifteen stitches were taken in the wound on her head and face. She had never seen accused prior to this time, and testified that she was not drinking beer, or anything else.

Wayne V. Stickney testified to being at the Elm Tree Drive Inn; that he had drunk two or three beers while there; that as they were preparing to leave he and his wife were standing at the Thompson car talking when accused backed into his left front fender. Witness called to defendant to wait a minute, went to his own car, found "my car was not damaged much, if any" and he told defendant, "That is all right. Go ahead." That accused jumped out of his car and asked witness what he wanted. He was asked:

"Q. Was he carrying anything in his hand? A. When he first got out? Q. Yes, when he first got out of his car? A. No, sir. Q. What did you then do after he first got out of his car? A. I went to my car and as I did, Sandy turned and went back to his car. I got out of my car and I had a piece of steel 8 or 12 inches long. Q. How far out of your car did you get? A. I didn't get very far, just outside of the door. Q. Were you sitting in the driver's seat or standing on the driver's side? A. Yes. Q. Your door was open? A. Yes, sir, wide open. Q. What instrument or object did the defendant, Ralph Thomas Sandy, procure when he went back to his automobile? A. A bumper jack. * * * Well, at the time, whenever Mr. Sandy got back to his car, he brought the bumper jack out. I stepped back into my car. The door was open and I can't say—I don't know whether Mr. Sandy swung at me or not with the bumper jack. I didn't see it. Anyway, he leaned over in my car and reached in to pull me out and I kicked him in the chest to get him out. As he got up, I got up and June was there and he stopped and turned and looked at her and hit her with the bumper jack. * * * Q. Can you recall whether or not at the time that Sandy—after he got up from being on the ground, can you recall at that time whether or not he had the bumper jack in his hand? A. Yes. Q. Can you recall the manner in which the defendant, Ralph Thomas Sandy, swung upon the complaining witness, June Thompson? A. I don't know for sure but I do know that he swung—I think he swung from the ground up, and upward stroke. I don't know. It might have been a square stroke, but I know he swung around and had the bumper jack down by his side. Q. Had June Thompson at that time touched the defendant? A. No sir, she had not."

Mrs. Clarice Stickney corroborated her sister-in-law and husband, and added nothing new to the evidence. J. C. Thompson also testified for the state. He was sitting in his car when the trouble started. He testified:

"By the time I had got out of my car and got over there, he had hit her [June L. Fitzer—at the time of the trial the wife of this witness] and I said, 'Who hit June?' And Sandy said, 'I did.' He said, 'I hit her', and he said, 'I'll hit you if you don't get out of the God-damned way.' * * * Q. You actually heard that? A. Yes, I actually heard that. Q. State whether you actually saw the striking of Mrs. Thompson. A. No, I did not."

This witness testified that he had two or three beers.

Ross Biggers, deputy sheriff of Oklahoma county, testified that he was called to the Elm Tree Tavern on the night in question, that there were two officers and three people there when he arrived, and that he saw June Fitzer at the hospital, and that:

"She had a place over one eye, I don't remember which eye it was, a cut across the forehead and down into the temple. The doctors were working on her and were taking some stitches."

The defendant testified that as he was leaving the tavern Wayne Stickney:

"hollered, 'Hey, wait a minute', and I didn't figure he was hollering at me because I hadn't run into his car and he went over to his car and I was backing up. Q. You were backing up? A. I was backing up. The parking space was pretty small. Q. Let me ask you this question, Mr. Sandy: When was the first time that you knew anything about the accusation that you had run into his car? A. Well—i turned around to see where I was backing up to and he got in his car and got a jack handle or whatever it was he had and started over to my car. Q. Mr. Stickney started over to your car? A. Yes, sir. Q. What did he say when he got there? A. I don't remember. Q. Well, did he start to get in your car? A. Well—he came over there either to drag me out or to get in. Q. Did you open the door to get out? A. He had his hand on the door and opened the door for me. Q. Did he have anything in his hand? A. Yes, sir. Q. What was it, as near as you remember? A. I wouldn't know unless it was a crank handle or a jack handle, or something. Q. How large was it? A. (Indicating) It was about that long. Q. Now, what did you do with reference to this particular instrument that he had in his hand? A. Well, I noticed him when he came up and I reached behind the seat and got my jack and when he came up to the door, I just shoved it open and grabbed his hand. Q. The one he had the instrument in? A. Yes."

He testified that Stickney ran and jumped in his car, and witness followed him over, leaned the bumper jack against the side of the car and got hold of Stickney's foot in an effort to pull him out of his car. That:

"Someone run up and grabbed me and pulled me out of the car and when they did, I just grabbed the jack and swung over my shoulder. Q. Now, did you know who it was that run up behind you, or did you feel like you might be in some danger? A. I didn't know. Q. And at that time, you wanted to protect yourself? A. Yes, sir."

On cross-examination defendant admitted that he had been arrested and fined for drunkenness and reckless driving twice, and fined for disorderly conduct. He stated positively that he was not drinking on this occasion, although this was his third trip to the tavern that night. He testified that he did not back into any car. He further testified that June Fitzer grabbed him around the waist, that he had hold of Stickney's foot pulling in an effort to pull him out of the car, and that she pulled him out "by her and my force together." He did not know who was pulling him, but,

"When she pulled me back from the car, I grabbed the jack which was leaning up beside the car. Q. You got out of the car and then got the jack and swung at her? A. When she pulled me out. Q. At that time, you picked up the jack? A. That is right. Q. And then you went over and swung at her; that is right, Sandy? A. I swung just as I picked it up. Q. All in one swing? A. All in one swing. Q. Where was the jack resting on the ground? A. It wasn't on the ground. It was leaning up by the side of the car."

As stated by the Attorney General, the testimony of the various witnesses is very conflicting in many of the essential points involved. This court has repeatedly held that where the evidence is conflicting, the weight of the evidence and the credibility of the witnesses is for the jury, and this court will not substitute its judgment for that of the jury where there is evidence reasonably

tending to support the conclusion arrived at by the jury. We feel that there is sufficient evidence in the record to support the verdict of the jury in this case. Graham v. State, 80 Okla. Cr. 159, 157 P. 2d 758; Coats v. State, 90 Okla. Cr., 217, 212 P. 2d 141; Brown v. State, 92 Okla. Cr. 448, 224, P. 2d 614, and cases cited in these cases.

Under the second proposition, that the court did not have jurisdiction of this cause because the information fails to state facts sufficient to show commission of the crime charged, defendant argues that "the information is insufficient in that the description of the weapon used is meager and lacking in particulars necessary to properly describe and identify it, that the manner in which it was used was not alleged and the effect produced thereby was not alleged or proven."

Tit. 22 O.S.A. § 402 provides:

"The indictment or information must be direct and certain as it regards:

"1. The party charged.

"2. The offense charged.

"3. The particular circumstances of the offense charged, when they are necessary to constitute a complete offense."

And Tit. 22 O.S.A. § 410 is:

"No indictment or information is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

We think the information in this case sufficient under the requirements of the statute. The true test of the sufficiency of an information is not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet.

While the information in this case is not a model, a careful reading of the entire record reveals that after the filing of the information, defendant entered a plea of not guilty, and at no time was a demurrer or motion to quash the information filed. No objection was made to the introduction of evidence by the State, and the sufficiency of the information was not challenged in the motion for new trial. The question is raised for the first time in the brief of defendant filed in this court.

It has been the uniform holding of this court that in order to attack an information it is necessary to file a demurrer or motion to quash and set aside the information. The only exceptions are when the error is fundamental, or the information is insufficient to give the court jurisdiction. The reason for the rule is that one may not be permitted to go to trial and speculate on a verdict of not guilty, and then after a verdict of guilty is returned, challenge the sufficiency of the information. If the sufficiency of the information is raised at the proper time, the county attorney will have an opportunity to amend the information and proceed to trial, in the event the motion is sustained. In Willis v. State, 64 Okla. Cr. 213, 78 P. 2d 840, 841, this court said:

"It is strenuously insisted that there was a defect in the information which entitled the defendant to a reversal of the judgment against him.

"An information cannot be attacked upon appeal unless some foundation was laid therefor before final judgment was rendered. The defendant may take advantage of a defective information by demurring thereto before the trial, by objecting to the introduction of evidence on the ground that the facts stated do not constitute a public offense, or by motion in arrest of judgment.

"The function of a demurrer is to defeat the information without a trial whenever it appears that it is subject to any one or more of the five objections named in the statute, section 2948, St. 1931, 22 Okla. St. Ann. § 504. These objections can be taken only by demurrer.

"Except that the objection to the jurisdiction of the court over the subject of the indictment or information, or that the facts stated do not constitute a public offense may be taken at the trial, under the plea of not guilty, and in arrest of judgment.' (citing cases) * * * It follows that we cannot consider the questions argued as to the insufficiency of the information because they were not raised as authorized by statute. This court cannot consider questions that were not raised in the trial court as authorized by statute, unless fundamental error prejudicial to the substantial rights of appellant is apparent." (Citing cases.)

We do not consider the matters complained of fundamental, and it is our opinion that the accused waived his right to attack the information in this case. Warren v. State, 24 Okla. Cr. 6, 215 P. 635; Clasby v. State, 78 Okla. Cr. 45, 143 P. 2d 430; Courtney v. State, 79 Okla. Cr. 206, 153 P. 2d 243; and see also Rausch v. State, 65 Okla. Cr. 52, 82 P. 2d 687.

The third proposition is that the verdict is excessive, is not responsive to the issues, and is not supported by the law.

The Attorney General in the closing paragraph of the brief filed on behalf of the state, says:

"It is finally contended by defendant that the punishment imposed by the trial judge was excessive. A careful examination of the entire testimony will disclose that such contention is not wholly without merit."

With this observation we are inclined to agree, especially in view of the fact that four of the State's five witnesses were members of one family, and closely related.

The judgment and sentence of one year in the county jail is therefore modified to a term of three months in the county jail of Oklahoma county, and as thus modified, the judgment rendered on the verdict is affirmed.

BRETT, P. J., and JONES, J., concur.